IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Habeeb Abdul Malik, a/k/a<br>Ron Tearia Nicholas, #231677,<br><br>Plaintiff,<br><br>vs.<br><br>Jon E. Ozmint, Director of SCDC;<br>S. Parker, Sergeant at Kirkland<br>Correctional Institution; and Wilbert<br>McGraw, Lieutenant at Kirkland<br>Correctional Institution;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 8:05-3472-RBH-BHH<br><br>**REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE** |

This matter is before the Court on the defendants' motion for summary judgment [Doc. 55] and the plaintiff's motions for temporary restraining order and preliminary injunction [Doc. 85, 123]. The plaintiff, who is proceeding *pro se*, is currently housed in the Maximum Security Unit (MSU) at Kirkland Correctional Institution (KCI). In his Amended Complaint, the plaintiff generally alleges that his ability to exercise his religion as a Sunni Muslim has been impeded as a result of application of certain grooming policies of the South Carolina Department of Corrections ("SCDC"). On a previous motion for summary judgment of the defendants, all claims in this case were dismissed with prejudice, except for the plaintiff's claim pursuant to Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1, concerning grooming practices.

By order of the district court, this case was recommitted to the undersigned and the defendants were granted leave to file additional dispositive motions concerning the remaining grooming claim. This defendants' filed a second motion for summary judgment

regarding that claim [Doc. 55]. By order, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the motion. On November 15, 2006, the plaintiff filed a response to the motion for summary judgment.

Consideration of that motion was delayed during the pendency of the plaintiff's interlocutory appeal concerning his other claims. That appeal was denied and the undersigned entered a Report recommending that the defendants' second motion for summary judgment be granted, on October 1, 2007. [Doc. 75.]

The district court subsequently stayed the entire matter in anticipation of the Fourth Circuit's ruling in a separate but related case, also concerning the Grooming Policy at issue here. The Fourth Circuit recently remanded the related case, *Smith v. Ozmint,* 578 F.3d 246, 251 (4th Cir. 2009), for further proceedings. As a result, the stay in this case was lifted by the district judge; the undersigned's prior Report was not adopted; and the parties were given additional opportunity to supplement their briefing in light of the decision in *Smith v. Ozmint*. [Doc. 107.] As of February 1, 2010, the case was finally and fully ripe for resolution.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983 or filed by individuals proceeding *pro se*, and submit findings and recommendations to the District Court.

## LAW AND ANAYLSIS

### LIBERAL CONSTRUCTION OF *PRO SE* COMPLAINT

The petitioner brought this action *pro se*. This fact requires that his pleadings be accorded liberal construction. *Estelle v. Gamble*, 429 U.S.97 (1976); *Haines v. Kerner*, 404 U.S. 519 (1972); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir.1978); *Gordon v. Leeke*, 574

F.2d 1147 (4th 1978). *Pro se* pleadings are held to a less stringent standard than those drafted by attorneys. *Hughes v. Rowe*, 449 U.S. 5 (1980) (per curiam). Even under this less stringent standard, however, the *pro se* Complaint is still subject to summary dismissal. The mandated liberal construction means only that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so. *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir.1999). A court may not construct the petitioner's legal arguments for him. *Small v. Endicott*, 998 F.2d 411 (7th Cir.1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir.1985).

### Summary Judgment Standard of Review

The requirement of liberal construction does not mean that the court can assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. *See* Fed. R. Civ. P. 56(c). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

## DISCUSSION

The plaintiff contends that the SCDC's Grooming Policy, SCDC Policy No. OP-22.13, which requires all inmates, regardless of security level, to keep their hair short and their faces shaven (*see* Ward Aff. Ex. A),[1] substantially burdens his free exercise of religion under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1.  Prior to the passage of the RLUIPA, a previous version of this policy was upheld by the Fourth Circuit in *Hines v. South Carolina Department of Corrections*, 148 F.3d 353 (4th Cir. 1998).  Obviously, the Fourth Circuit was unable to address the impact of RLUIPA on the enforceability of the grooming policy at that time because it was not in effect.  But, the Fourth Circuit has subsequently held that the neutrality principle, relied upon in *Hines*, did not foreclose liability under RLUIPA. *See Smith v. Ozmint,* 578 F.3d 246, 251 (4th Cir. 2009) (citing *Madison v. Riter*, 355 F.3d 310, 315 (4th Cir.2003).

Since the *Hines* decision, the grooming policy has been amended in two respects, material to this case, both of which the plaintiff emphasizes.  First, it now authorizes forced haircuts and shaves if an inmate refuses to comply with the policy [2]  and, second, it has been made applicable to all inmates including those, like the plaintiff, who are housed in higher levels of custody, including the Maximum Security Units ("MSU") and the Special Management Units ("SMU").  (Ward Aff. ¶ 2.)

_____

[1]  The SCDC's Grooming Policy, OP-22.13, which was enacted on March 20, 2004, provides, "All male inmates' hair must be neatly cut (not to exceed one inch in length) and must remain above the shirt collar and above the ear (not touching the ear)," and "no inmate will be permitted to wear a beard . . . ."  (Doc. 55-2, Ex. B.) The policy further provides, "Inmates may be given forced haircuts or shaves if they refuse to comply with the haircut and shave policy." *Id*.  Ex. A.

[2]  The amendment to require forced haircuts and shavings appears to have been made effective as of May 1, 2004. [Doc. 55-2 ¶2.] *Hines* clearly indicates that at the time that case was decided, forced haircuts and shavings were not permissible under the grooming policy.  See *Hines*, 148 F.3d at 356 ("No prisoners are forcibly shaved or shorn.")  Instead, inmates who refused to comply with the grooming policy were reclassified to a more restrictive security level. *Id*.

Numerous decisions of the Fourth Circuit and this district have dealt with the grooming policy, through the years, and found it materially unobjectionable in every instance. *See, e.g.*, *Hines v. South Carolina Department of Corrections*, 148 F.3d 353 (4th Cir. 1998); *Roberts v. Ozmint*, 2006 WL 2303183, at *2 (D.S.C. August 8, 2006)*; Strong v. Ozmint*, C.A. No. 2:03-2256-24AJ, at 30 (D.S.C. Sept. 28, 2005), *affirmed by* 2004 WL 1790208, at *1 (4th Cir. 2004) (unpublished)*; Caprood v. Moore*, C.A. No. 0:98-0603-22BD (D.S.C. 1999) (denying motion for preliminary injunction to stop prison officials from using force to cut the inmate's head or face hair); *Smith v. Casey*, C.A. No. 0:97-2034-23BD (D.S.C.1998) (denying motion for preliminary injunction to stop prison officials from enforcing SCDC's Grooming Policy).

Until now, the Fourth Circuit, had not taken the occasion to affirm or reject the grooming policy, as amended, either under the RLUIPA or otherwise. In the recent decision of *Smith v. Ozmint*, however, the case for which this matter was stayed, the Fourth Circuit considered application of the RLUIPA to the grooming policy, but found an insufficient evidentiary showing by the defendants to allow any determination as to whether the policy served a compelling government interest and was the least restrictive means to compel it. *Smith*, 578 F.3d at 253. The defendants' evidence failed, principally, because it related to interests prison officials might have in the enforcement of the policy as against *SMU* inmates, as opposed to inmates housed in the MSU, a higher security unit, like the plaintiff. *Id*. at 252-54. The court of appeals remanded the case for further proceedings without making any determination as to whether the Grooming Policy is violative of the RLUIPA.

As a result of the remand, the Honorable Judge Harwell permitted the parties additional time to submit supplemental briefing in this case. The time for such submissions has now expired and the Court has before it renewed and appropriately tailored argument and evidence on whether the Grooming Policy properly serves a compelling governmental

interest in a way least restrictive to the exercise of the plaintiff's religious beliefs concerning his hair.

## I.    The RLUIPA Claim

Section 2000cc-1(a) of the RLUIPA provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a); *see Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005).

Before considering the particular demands of the statute, the Court would confess its own solidarity with the interests served by the RLUIPA that inmates not check at the door of their incarceration every detail of what makes them sentient and spiritual beings, to the extent we are , in fact, so comprised.  The undersigned does not take lightly any intrusion upon beliefs genuinely held in the pursuit of faith, however expressed.  In concluding that the generalized interests in safety and security outweigh the individual interests in personal worship, the Court does not mean to minimize the latter.  In the administration of the difficult and dangerous circumstances of incarcerated individuals, oftentimes the special need must bend to the general good.  Prisons, by definition and purpose, are a restraint on liberty.  The effects of the Grooming Policy are merely an incident of the nature of that restraint, in the service of a compelling state interest.

### A.    Substantial Burden

To be actionable, the RLUIPA first requires that the actions of the state pose a substantial burden on the exercise of an inmate's religion.  As to this element, the parties agree, that the burden is on the plaintiff to show it.

6

The defendant has previously argued that *Hines* holds, as a matter of law, that the Grooming Policy, at issue, is only an "incidental" burden on the plaintiff's religion, *see Hines,* 148 F.3d at 358, and, therefore, cannot now be found "substantial." As stated, the Fourth Circuit, in *Smith v. Ozmint*, rejected this argument insofar as the affirmation of the policy at issue in *Hines* was based simply on its neutral and facial applicability, a defense not dispositive under the RLUIPA. *See Smith*, 578 F.3d at 246. *Hines*, therefore, does not speak to whether the burden, if any, imposed by the Policy at issue in this case, is "substantial" in the way that the RLUIPA defines that term.

The defendants have further argued that the plaintiff cannot satisfy the "substantial burden" element of his claim because his professed religious observation is, in fact, not genuine. The plaintiff, however, has sworn his sincere allegiance to Al-Islam, outlining his adherence to its tenants and practices, including the obligation not to shave the beard. [Doc. 116-2 at 4, 23-25.] In further support, he had previously submitted the responses of Mutahir Sabree, a Muslim Chaplain at Kirkland Correctional Institution, given in response to requests to admit, served in a separate action, *Nichols v. Sabree*, 8:06-319-RBH-BHH. [Doc. 58, Ex. A at 4.] The request to admit queries Sabree as to whether "Islam prohibit [sic] a Muslim from shaving his beard?" *Id*. In response, Sabree states, "Yes, there is a comment from Muhammad in the Hadith to let the beard grow." *Id*.

It appears that the plaintiff's evidence is sufficient. *See Smith*, 578 F.3d at 251. It is not for the undersigned to "judge the significance of the particular belief or practice in question." *Id*. (quotation omitted). It is enough that the plaintiff has sworn that the Grooming Policy compels "him to modify his behavior in violation of his genuinely held religious beliefs." *Id*. The centrality or importance of the belief held is not significant. As the Fourth Circuit noted, "religious exercise" is defined simply as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief.," 42 U.S.C. § 2000cc-5(7). *Smith*, 578 F.3d at 21.

The defendants would contend, however, that the plaintiff has inconsistently represented the nature of his religious affiliation, sometimes Nation of Islam, sometimes Rastafarian, sometimes Sunni Muslim. The Court would first say that the RLUIPA certainly does not preclude an inquiry into "the sincerity of a prisoner's professed religiosity." *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir.2006). But, the Court disagrees that the plaintiff's representations, in prior lawsuits, necessarily show the kind of inconsistency alleged by the defendants. In two cases, including the present, the plaintiff claimed some sect of Islam, *see Nicholas v. Ozmint*, Civil Action No. 8:04-22471-RBH-BHH, while in another, he indicated some adherence to Rastafarianism, *Nicholas v. Ozmint*, Civil Action No. 8:05-29-RBH-BHH.

There is not sufficient evidence in the record to make any determination as to the compatibility of Islam and Rastafarianism. Moreover, there is no evidence as to what negative inferences should be drawn, if any, from the plaintiff differently affiliating himself with more than one Islamic sect. And, frankly, under the relevant case law, it does not seem material whether or not a second party finds consistency or logic in the belief system held, so long as it is held genuinely. *See Smith*, 578 F.3d at 251; *Lovelace*, 472 F.3d at 187 n.2. So if the plaintiff earnestly believed in some theological cocktail of Islam, Rastafarianism, and Heaven's Gate science, then his amalgamation of beliefs could not be substantially burdened, regardless of the logic of their internal or traditional relationship. Of course, that is not to say that shifting representations as to religious affiliation are not evidence of a want of genuineness. A jury might reasonably conclude that he has changed or modified his beliefs out of convenience or some legal strategy. The Court has simply concluded that issues of fact exist, on the strength of the plaintiff's testimony, as to whether his beliefs are genuinely held and substantially burdened. Accordingly, the plaintiff's affidavit is effective to create issues of fact sufficient to survive summary judgment as to the burden imposed by the Policy, whether substantial or not, on beliefs genuinely held.

## B. Compelling Interest

In response to the plaintiff's showing, the defendants must show that the Grooming Policy furthers a compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a). To meet its burden, the SCDC's "first job" is "to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs." *Smith*, 578 F.3d at 252 (qouting *Lovelace*, 472 F.3d at 190). The defendants have offered the affidavit of Robert E. Ward, Director of the Division of Operations, in support.

Ward starts by emphasizing that the security concerns, which constituted a compelling interest in *Hines*, 148 F.3d at 358 for SMU inmates, are even more compelling for the MSU. The inmates in the MSU are there precisely because they have shown themselves to be a particularized and high security risk. (Ward Aff. ¶ 9.)[3] The MSU is not used for punishment but is specifically designed to control and minimize the risks these inmates pose. *Id*. ¶¶ 10, 11.

The defendants would emphasize, as compelling, the following interests ostensibly served by the Policy:

- providing security and safety of the prison population, officers, and public at large
- maintaining the "control" element of MSU's rehabilitative goals, to correct inmate behavior
- mitigating tools of disguise upon escape
- preserving limited maximum security space

All of these interests have been repeatedly affirmed as compelling. See *Hines*, 148 F.3d at 358.

---

[3] Unless otherwise designated, affidavits cited refer to evidence submitted with the supplemental briefs of the parties.

The Court is principally persuaded by the first. It is paramount and one that justifies the need for the Policy at issue, with or without recourse to other incidental, even if compelling, concerns.

### 1.    Safety and Security

The record reflects that long hair poses three types of risks, all related to the ability and the propensity of inmates to hide weapons, contraband, devices of escape, and/or bodily fluids therein. (Ward Aff. ¶¶ 28, 29.)   First, long hair enables threats to the general security and control of the MSU.  Hidden weapons or implements of escape pose a direct threat of violence. (See Lane Aff. ¶ 15.) Hidden weapons can be used to attack and injure SCDC personnel and other inmates.   Gary Lane, formerly the Captain in charge of operations and security in MSU, has specifically sworn regarding prior incidents of inmates having created homemade weapons including "shanks" and knives. *Id*. ¶ 17. Lane has sworn that MSU inmates are remarkably resourceful, employing common items in unpredictably dangerous ways. *Id*. ¶ 15. Lane states that "[e]ven in the MSU, inmates somehow manage to fashion such devices." *Id*. Lane is aware of "many" times such items have been found among the population of the MSU. *Id*. Illustratively, Lane cites a "toothbrush with a razorblade placed on one end, a pencil with a razorblade attached to one end, a plumbing drain cover that was removed and made into a hatchet, fence material shaprened to a point that would be used to stab someone, and shampoo bottle modified to squirt a feces and urine mixture onto staff." *Id*. ¶ 18. Lane has sworn that these items have been easily concealed in long and matted hair. *Id*. ¶¶ 16, 19. He laments that "it is a constant and daily struggle for the MSU staff to locate and eliminate these items from the facility." *Id*. ¶ 17. But, Lane contends that the prohibition of such hairstyles has eliminated a common hiding place for them. *Id*. ¶¶ 16, 19.

Second, concealed weapons or contraband pose an incidental safety risk to officers

in the performance of their general security duties to search MSU inmates routinely. SCDC personnel have greater interaction with MSU inmates, in both frequency and intimacy, than personnel in any other unit. (Ward 25.) Every single time an MSU inmate is removed from, or returned to, his cell, he must be strip searched, including an inspection of the inmate's hair. *Id*. ¶ 23. The record reveals that inmates set purposeful "traps" in their hair, including needles, hooks, razors, pins, and staples, which pose risk of bodily harm, ranging from the rather minor affliction of a prick to the more serious concern over transmission of blood-borne pathogens. *Id*.

As a related concern, short hair aids in both the efficiency and effectiveness of these common searches. *See id.* By contrast, long hair disincentivizes thoroughness. Besides the hygiene issues one might reasonably anticipate in the searching of an another person's hair, officers face the added potentiality that inmates will have smeared on, or otherwise applied bodily fluids to, their hair, including feces, blood, urine, and/or semen. *Id*. ¶ 29. Ward has sworn to the occurrence of such incidents. *Id*. It does not seem a phenomenon lightly dismissed, even though theoretically one which might be cured through the personal resolve of the individual officer, that the presence of such fluids or "traps" would both consciously and subconsciously impede the enthusiasm and, ultimately, the quality of their efforts. The literal and psychological barriers to effective examination, which long hair erects, are compelling. *See Hines*, 148 F.3d at 358. ("[S]earches of inmates with long hair are less effective and more time consuming than searches of inmates with short hair.")

Lastly, long hair abets the development and success of escape tools. Inmates have used "small slivers of metal to disable handcuffs and other restraint devices." (Lane ¶ Aff. 16.) Lane is specifically aware of an occasion where an "MSU inmate managed to obtain a piece of fence material that he was able to transform into a small handcuff key." *Id*. Inmates hide such devices in long hair, making them very difficult to detect even under

optimal circumstances.  *Id*.  Lane attests to the obvious:  "[t]his allows them to remove these restraints and assault staff and attempt to escape from custody."  *Id*.

As stated, all three safety and security risks are enabled by the superior concealment afforded by long and matted hair and, in Lane's professional and relevant experience, shorter hair conversely reduces them – the risks.  *Id*. ¶ 16, 19.

### 2.    Other Interests

As in *Hines*, the defendants have reasserted that the Grooming Policy increases the ease of identifying inmates upon escape.  (Ward Aff. ¶ 34-35.)  By permitting long hair in the MSU, inmates are given the opportunity, upon escape, to dramatically alter their appearance by simply shaving facial and long hair.  *Id*.  Ward attests that escape from the MSU has happened and remains a reasonable and serioius possibility.  *Id*.

As an additional compelling interest, the defendants have also emphasized the control dimension of the MSU, not simply in the sense that the inmates housed there must be brought under physical control but that affecting control over them is part of the process of actually correcting their behavior such that they can be returned to the general population.  *Id*. ¶ 10.

Finally, Ward indicates that the modified grooming policy has served the important purpose of making additional cell space available in MSU units to house inmates who legitimately pose security threats rather than inmates who were housed in such units simply because they refused to comply with the grooming standards and, therefore, could not be returned to the SMU.  (Ward Aff. ¶ 36.)  Ward's affidavit only confirms the predictable consequence to a permissive policy that offering such a choice would likely place inmates in high custody units at the expense of space needed to house those who pose greater risk.

The Court need not consider these interests in any great detail.  Courts have routinely found them to be "well established" as compelling.  *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996)*; see also Hines*, 148 F.3d at 358.  The Court would so

recommend here. The defendants' defense of the Policy, in the undersigned's estimation, does not rise and fall with them. The safety/security concerns are compelling enough.

The Fourth Circuit has already resolved as much. *See Hines,* 148 F.3d at 358. Neither the amendments to the policy, made applicable to the MSU, nor the heightened scrutiny of the RLUIPA, ought alter that conclusion. The interests remain compelling and the defendants have met their burden in that regard, as to the MSU specifically.

### C.      Least Restrictive Means

Not only must the defendants establish compelling interests served by the Policy, but they must demonstrate that the Policy guards those interests in the least restrictive way. It does not appear that the phrase "least restrictive means" is actually defined in the statute. *See* 42 U.S.C.A. § 2000cc-3; 42 U.S.C.A. § 2000cc-5. Courts have been inclined to give the phrase its plain meaning, however. *See Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 332 (5th Cir. 2009). Thus, "'least restrictive means,' as one would naturally interpret the phrase, signifies that the imposition by the government on religious worship must be the minimal imposition to accomplish the government's compelling ends." *U.S. v. Hardman,* 297 F.3d 1116, 1144 (10th Cir. 2002).

Numerous other courts have already found that grooming regulations, including the forced cutting of hair, meet the "least restrictive means" criteria, even under a "strict scrutiny" analysis. *See Fegans v. Norris,* 537 F.3d 897, 905-06 (8th Cir. 2008); *Hoevenaar v. Lazaroff*, 422 F.3d 366, 371-72 (6th Cir.2005); *Brunskill v. Boyd*, 141 Fed. Appx. 771, 775-76 (11th Cir. 2005)*; Daker v. Washington*, 469 F. Supp. 2d 1231, 1239 (N.D. Ga. Jan. 16, 2007) (finding shaving policy was least restrictive means and did not violate RLUIPA)*; Clark v. Briley*, No. 03-3852, 2005 WL 2369330 at *2-4 (N.D.Ill. Sept. 26, 2005) (finding that forcing inmate to submit to a haircut was the least restrictive means of meeting the safety and security concerns at the prison).

Under the previous Religious Freedom Restoration Act (RFRA), other courts had concluded that short hair and beards in maximum security units are, in fact, the least restrictive means to serve the interests of security and order. *See Harris v. Chapman*, 97 F.3d 499, 503-04 (11th Cir.1996) (finding state's "compelling interest in security and order within their prisons" especially applies "in 'close custody' facilities like MCI which contain extremely violent offenders" and stating "we are unable to suggest any lesser means than a hair length rule for satisfying these interests"); *Hamilton v. Schriro*, 74 F.3d 1545, 1555 (8th Cir.1996) ("It is more than merely 'eminently reasonable' for a maximum security prison to prohibit inmates from having long hair in which they could conceal contraband and weapons. It is compelling. . . . Moreover, there is no viable less restrictive means of addressing these concerns."). Although overturned, *see City of Boerne v. Flores*, 521 U.S. 507 (1997), courts have found these observations in RFRA cases equally applicable to RLUIPA. *See Fegans v. Norris*, 537 F.3d 897, 903 (8th Cir. 2008).

Additionally, on remand, in *Smith* v. Ozmint, Civil Action No. 9:04-1819-PMD-BM, the Honorable Bristow Marchant, Magistrate Judge for the District of South Carolina, has again recommended that the district court conclude that the Grooming Policy serves compelling state interests and in the least restrictive way. [Doc. 302.] This Court is independently persuaded to concur in this recommendation to the district court.

The plaintiff, in this case, however, would contend that the defendants cannot, in fact, show the Grooming Policy to be the least restrictive approach for two reasons. First, he contends that the defendants have not considered and rejected any alternative means and, second, because he argues that a religious exemption would be a lesser restrictive approach to accomplish the same compelling ends, as evidenced by its use in certain other jurisdictions.

The Court would agree with the plaintiff that the defendants cannot meet their burden to prove least restrictive means unless they demonstrate that they have actually considered

and rejected the efficacy of less restrictive measures before adopting the challenged practice. See *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 824 (2000) (finding, in context of First Amendment challenge to speech restrictions, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective"); *City of Richmond v. J.A. Croson*, 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (holding that city's minority set-aside program was not narrowly tailored in part because city had not considered whether race neutral measures would have achieved government's interest); *Warsoldier v. Woodford*, 418 F.3d 989, 999-1001 (9th Cir. 2005). In this case, however, not only have the defendants *considered* the less restrictive measure proposed by the plaintiff – non-application of the policy to higher custody units based upon an exemption – they have actually operated based on such a measure.

The defendants have submitted the affidavit of Robert Ward, evidencing reasons for why it was necessary to extend forced application of the grooming policy to inmates housed in higher custody levels including MSU. Ward has stated that earlier attempts by the SCDC to allow inmates in certain high custody units to grow their hair proved "difficult and unworkable." [Doc. 55-2 ¶ 3.] The Grooming Policy was originally amended to allow inmates to elect to grow their hair longer but be reclassified to a higher custody level. *Id*. Experience showed, however, that long hair provided the inmates -- even those in higher custody housing -- with places to hide contraband. *Id*. ¶ 8. Ward describes a situation in January 2004, in the SMU at Broad River Correctional Institution, where keys were taken from an officer and used to release inmates. *Id*. The keys remained missing even after the disturbance was quelled, and it was believed that the missing keys were concealed in long hair. *Id*. It was only after the forced haircuts of all inmates were ordered that the keys were located. *Id*. ¶ 8.

So not only have the defendants considered and rejected alternative approaches, they have effectively considered the precise alternative, which the plaintiff would now

propose – an exemption.  The plaintiff argues that the SCDC should institute a religious exemption for those MSU inmates who require accommodation of a religious requirement to keep the hair or beard long.  The plaintiff offers that a sincerity inquiry could readily be performed to guard against manipulation of the exemption.  As discussed, this has proven ineffectual.  [See Doc. 55-2 3.]

Moreover, the Court does not understand how an "exemption" from the Policy qualifies as a lesser restrictive means.  An exemption is not a means.  It is an exception.  And having to search the lengthy and problematic hair of those who would qualify for the exemption is not some means apart from the Grooming Policy; it is simply what would be necessary in the absence of the Grooming Policy.  It seems that to defeat the defendants' Policy as not the "least restrictive means" would require a showing of some intermediate solution between that which has been proposed and the natural state of affairs absent the proposal.  A religious exemption simply returns those inmates to the *status quo*.  It does not actually offer some alternate, but lesser restrictive, *mean*s.  It certainly does not serve, only somehow differently, the hygeine and security risks which long hair poses.  And, frankly, the Fourth Circuit has already so implied, albeit in an unpublished decision.

In *McRae v. Johnson*, 261 Fed. Appx. 554, 559 (4th Cir. 2008), the Fourth Circuit found that an exemption, effectuated through segregation, "would not alleviate the security concern associated with housing all inmates claiming religious exemption in the same facility, as those individuals, without being isolated from each other, ***would have access to each other along with the ability to hide contraband in their long hair and/or beards***." *Id*. (emphasis added).     In other words, exempting, separating, or otherwise attempting to isolate inmates, literally or procedurally, based on some religious exemption, does nothing to actually eliminate the security and safety concerns posed by those specific individuals' long hair.  It is not an alternative, less or more restrictive; it is an exception.  The Eighth Circuit, has likewise rejected such an exemption for the exact same reasons.

16

*Fegans v. Norris*, 537 F.3d 897, 905-06 (8th Cir. 2008) ("This proposal, however, ***does not lessen the safety risk to correctional officials assigned to pat down the prisoners***, and it would place a strain on the ADC's facilities, which are already full." (emphasis added)). The proposed exemption is simply not a lesser restrictive means.

The Fourth Circuit, in *Smith*, expressed concern that the defendants had made "no attempt whatsoever to explain that hygiene and security concerns in the MSU cannot be accommodated without forcibly shaving the heads of prisoners who wear long hair due to religious belief." *Smith*, 578 F.3d at 253. But, the defendants' evidentiary showing here makes it difficult for the Court to see how it might be any other way. Surely, most inmates will not consent to it. And, there has not been any suggestion to this Court as to what other way the serious security and safety concerns could be addressed other than to keep hair short. An exemption certainly does not address them. As unfortunate as they are, forced haircuts provide the only answer to the risk posed by long hair. To this end, it should be noted that forced haircuts do not eliminate all security risks. Surely that cannot be the inquiry. The undersigned believes the inquiry is whether the Grooming Policy is the least restrictive method of reducing the specific risk posed by *hidden weapons and contraband in hair*. Simply because MSU inmates might hide such items elsewhere on, or in, their person, does not mean that the Grooming Policy does not still constitute the best and least restrictive response to the specific security threat posed by hair.

Because the plaintiff's proposal "would allow accommodation of religious observances to override other significant state interests," the undersigned believes that Grooming Policy withstands scrutiny under RLUIPA as the least restrictive means. *Fegans v. Norris*, 537 F.3d 897, 905-06 (8th Cir. 2008). The fact that some prison systems employ the approach proposed by the plaintiff, (Pl. Supp. Resp. at 10 (Colorado, Ohio) is simply not dispositive. Courts have consistently agreed that deference should be extended to the expertise of the individuals responsible for the particularized circumstances of their penal

17

institution. *See Cutter v. Wilkinson,* 544 U.S. 709, 723 (2005); *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999). And, while comparison to successful approaches at other institutions is relevant, it is far from controlling. *See Fegans*, 537 F.3d at 905. "Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers." *Id.*; *see McRae*, 261 Fed. Appx. at 559. On the facts before the Court, there exist no issues of fact as to whether the Grooming Policy is the least restrictive means for the *SCDC*, whether or not it is for any other correctional system.

The plaintiff complains that the defendants have also not considered other alternatives, including the use of masks and gloves during hair searches. These alternatives, even in combination with anything else the plaintiff has proposed, do not blanket the spectrum of safety and security concerns. Gloves and masks are no shield against the weapon undiscovered due to unmanageably long and matted hair. Gloves and masks are no shield against needles, shanks, or other sharp pieces of metal which would tend to easily penetrate such defenses. (See Ward Aff. 38.) Although these items are, in fact, less restrictive, they do not properly serve the compelling interests established.

In contrast to the plaintiff's recommendations, the Court finds the Policy specifically tailored and least restrictive to rectify the concerns.

Lastly, the Fourth Circuit, in *Smith*, 578 F.3d at 254, raised concerns over why a different grooming standard is effective for female inmates and not for male inmates. The concern is echoed as argument by the plaintiff. Ward's response is exacting and worth quoting in full:

> I understand that a question has been raised as to the differing grooming standards for male and female inmates. It is well recognized in corrections that male and female prisoners present very different issues. Female inmates do not present

18

the type of security concerns presented by MSU inmates such as the Plaintiff. SCDC as a whole does not have problems with female inmates rioting, taking hostages, assaulting the correctional staff or other inmates with deadly force, or even using their hair to hide such contraband as weapons or handcuff keys. Female inmates pose a much lesser degree of danger than their male counterparts, and this is particularly true when female inmates are compared to the type of inmate housed in MSU. In addition, SCDC does not have any significant escape issue with female inmates, such that the ability to dramatically change one's appearance after escape is a critical security concern or a needed deterrent. Furthermore, because of the lack of facial hair and certain limitations on the types of hair styles which are permitted, female inmates are unable to dramatically change their appearance to even remotely the degree that male inmates could if allowed long hair and beards. It has also been the experience that female inmates generally maintain an appropriate level of personal hygiene and sanitation with longer hair than male inmates. It should also be noted that female inmates are not permitted to wear dreadlocks or similar hairstyles pursuant to the Grooming Policy. Thus, there is no difference between the policies with respect to the hairstyle that the Plaintiff is seeking in this litigation. Finally, there is not the same degree of contact and close interaction with inmates by the correctional staff in a women's prison as compared to that in MSU.

(Ward Aff. 40.) Ward's experience is corroborated by a Sandra Barrett who is uniquely qualified to address the issue, because she has substantial experience working with both male and female inmate populations. (See Barrett Aff. ¶¶ 3-9.) Barrett has observed that "[m]ale and female inmate populations are significantly different and present very different safety and security concerns and challenges." *Id*. ¶ 7. The SCDC has not experienced a problem with female inmates creating or being in the possession of homemade weapons or similar types of dangerous contraband. *Id*. ¶ 10. Additionally, Barrett has found female inmates to be "hyper-hygienic," whereas, "males typically have poorer hygiene habits. . . . [and] a much higher tolerance or acceptance of poor hygiene, both for themselves and others." *Id*. ¶ 13.

This same type of evidence and argument was before the Eighth Circuit in *Fegans*, including opinion that "[w]omen are not generally as violent as men. They are not as escape prone as men. They are not as prone to give us problems with contraband as men." *Fegans*, 537 F.3d at 905. The Eighth Circuit concluded that "the record here includes no

data to refute Norris's expert testimony about the relative security risks in the male and female facilities, and the district court credited Norris's unrebutted testimony. This finding of fact is not clearly erroneous, and given that factual premise, the district court correctly held that the differing hair regulations for men and women did not undermine the ADC's contention that its hair-length regulation for males was the least restrictive means available to satisfy security concerns." *Id*.

Likewise, Ward's representations are not rebutted by serious evidence to the contrary. His experience indicates that female inmates pose less risk of violence and escape, have less contact with SCDC personnel, and do not have facial hair of the same kind. (Ward Aff. 40.) The Court has no reason to reject the undisputed evidence, which also happens to comport with what one might expect, even if only anecdotally, to be the differences between the two populations. Accordingly, the Court would agree with *Fegans* that some differing treatment of female inmates is not evidence that there exists a less restrictive means for the male population.

The plaintiff complains that the defendants have been summary in their showing.[4] To the contrary, the Court finds that the defendants' evidence is substantially specific and composed of precise occurrences, including dates and facts, which expose the failing the alternatives proposed by the plaintiff. (See generally Ward, Lane Affs.) As stated, the Court will give great deference to the individuals endowed both with the responsibility and the expertise to make these difficult administrative decisions.

Accordingly, the defendants have met their burden to demonstrate that the grooming policy serves both a compelling interest and is the least restrictive means to do so.

---

[4] The plaintiff has previously cited to discovery responses of the defendant indicating that there is no evidence that the plaintiff's own hair has caused problems related to contraband, hygiene, etc. This point is of no moment. The defendants do not need an independent and compelling interest for each individual inmate in order to make application of the grooming policy under the RLUIPA.

## CONCLUSION

Wherefore, it is is RECOMMENDED that, the defendants' motion for summary judgment [Doc. 55] should be GRANTED and the plaintiff's RLUIPA claim dismissed *with prejudice*.  It is further RECOMMENDED that the plaintiff's motions for temporary restraining order and preliminary injunction [Doc. 85, 123] be DENIED as a result.

It is so RECOMMENDED.

s/Bruce H. Hendricks
United States Magistrate Judge

February 16, 2010
Greenville, South Carolina

**The plaintiff's attention is directed to the important notice on the next page**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 10768
Greenville, South Carolina 29603

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).